UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

INNOVA/PURE WATER, INC.

    Plaintiff

    v                       Case No. 8:99-cv-1781-T-23A

SAFARI WATER FILTRATION SYSTEMS, INC.,
d/b/a SAFARI OUTDOOR PRODUCTS

    Defendant

**F I L E D**

Date 8/31/ω

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA, FLORIDA

## INNOVA'S MOTION AND INCLUDED MEMORANDUM FOR
## PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT AND VALIDITY



# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................ i

LIST OF EXHIBITS ..................................................................................... v

I.      FACTUAL BACKGROUND ............................................................. 1

II.     SUMMARY JUDGMENT MOTION STANDARDS ........................... 2

III.    THE LAW REGARDING INFRINGEMENT ..................................... 3

IV.     THE RULES OF CLAIM CONSTRUCTION ..................................... 4

V.      LEGAL STANDARDS WITH RESPECT TO VALIDITY ..................... 7

VI.     THE SAFARI PRODUCT CLEARLY LITERALLY INFRINGES THE
        RELEVANT CLAIMS ..................................................................... 8

        A.      The Dispute Claim Terms Have Clear Unambiguous
                Meanings ......................................................................... 9

        B.      All of the Limitations of Claims 1, 5, 11, 15 and 17 through 20
                are Found in the Safari Product .......................................... 17

VII.    INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS ........ 18

VIII.   THE CLAIMS ARE CLEARLY VALID ............................................ 19

IX.     CONCLUSION .............................................................................. 19

## TABLE OF AUTHORITIES

Page

CASES

*Anderson v Liberty Lobby,*
106 S.Ct. 2505, 94 L.Ed.2d 292 (1986) ............................................................... 2

*Appolonio v Baxter,*
217 F.2d 267 (6th Cir. 1954) ............................................................................. 3

*Atmel Corp. v Information Storage Devices, Inc.,*
198 F.3d 1374 (Fed. Cir. 1999) ......................................................................... 8

*Barmag Barmer Maschinefabrik AG v Murata Mach., Ltd.,*
731 F.2d 831 (Fed. Cir. 1984) ........................................................................... 3

*Becton Kickinson & Co. v C.R. Bard, Inc.,*
922 F.2d 792 (Fed. Cir. 1990) ........................................................................... 4

*Bendix Corp. v U.S.,*
199 USPQ 203 (Ct. Cl. 1979) ........................................................................ 6, 16

*Celotex Corp. v Catrett,*
477 U.S. 317 (1986) ...................................................................................... 3, 4

*E.I. du Pont de Nemours & Co. v Phillips Petroleum Co.,*
849 F.2d 1430 (Fed. Cir. ),
*cert. denied,* 488 U.S. 986 (1988) ..................................................................... 4

*Genentech, Inc. v Chiron,*
112 F.3d 495 (Fed. Cir. 1997) .......................................................................... 13

*Gentex Corp. v Donnelly Corp.,*
69 F.3d 527 (Fed. Cir. 1995) ............................................................................. 4

*Graver Tank & Mfg. Co. v Linde Air Products Co.,*
339 U.S. 605 (1950) ........................................................................................ 18

*Hoechst Celanese Corp. v BP Chemicals, Ltd.,*
78 F.3d 1575, 1581 (Fed.Cir. 1996) ................................................................. 16

Page

*Hybritech, Inc. v Monoclonal Antibodies, Inc.,*
802 F.2d 1367 (Fed. Cir. 1986),
*cert. denied,* 107 S.Ct. 1606 (1987)..............................................................  3, 7

*Intellicall, Inc. v Phonometrics, Inc.,*
952 F.2d 1384 (Fed. Cir. 1992) ...............................................................  4

*International Glass Co. v United States,*
408 F.2d 395 (Ct. Cl. 1968) ...................................................................  8

*Intervet America v Kee-Vet Laboratories,*
887 F.2d 1050 (Fed. Cir. 1989) ...............................................................  5, 13

*Lemelson v United States,*
752 F.2d 1538 (Fed. Cir. 1985) ...............................................................  3

*Markman v Westview Instruments, Inc.,*
52 F.3d 967 (Fed. Cir. 1995),
*affirmed,* 116 S.Ct. 1384 (1996) ...........................................................  3, 4, 6

*Modine Mfg. Co. v U.S. Intern. Trade Comm'n,*
75 F.3d 1545 (Fed.Cir. 1996) .................................................................  14, 16

*North American Vaccine v American Cyanamid Co.,*
7 F.3d 1571, 1579 (Fed. Cir. 1993)..........................................................  3, 8, 19

*Palmer v Dudzik,*
481 F.2d 1377 (CCPA 1973) ..................................................................  7

*Paulik v Rizkalla,*
760 F.2d 1270 (Fed. Cir. 1985) ...............................................................  8

*Radio Steel & Mfg. Co. v MTD Products, Inc.,*
731 F.2d 840 (Fed. Cir. 1984) .................................................................  6, 17

*In re Reynolds,*
443 F.2d 384 (CCPA 1971) ....................................................................  15

*South Corporation v United States,*
690 F.2d 1368 (Fed. Cir. 1982) ...............................................................  7

Page

*Southwall Technologies, Inc. v Cardinal IG Co.,*
54 F.3d 1570 (Fed. Cir. 1995) ............................................................................. 4, 5

*SRI International v Matsushita Electric Corporation,*
775 F.2d 1107 (Fed. Cir. 1985) (*en banc*) ......................................................... Passim

*Stiftung v Renishaw PLC,*
945 F.2d 1173 (Fed. Cir. 1991) ........................................................................... 6, 17

*Studiengesellschaft Kohle mbH v Dart Industries,*
549 F.Supp. 716 (D. Del. 1982),
*affirmed,* 726 F.2d 724 (Fed. Cir. 1984) ............................................................ 7, 16

*Temco Electric Motor Co. v Apco Mfg. Co.,*
275 U.S. 319 (1928) ............................................................................................. 6, 17

*Warner Jenkinson v Hilton Davis Chemical Co.,*
117 S.Ct. 1040 (1997) .......................................................................................... 18

*Woodland Trust v Flower Tree Nursery,*
148 F.3d 1368 1373 (Fed. Cir. 1998) ................................................................. 3, 7, 18

*Vitronics Corp. v Conceptronic, Inc.,*
90 F.3d 1576 (Fed. Cir. 1996) ............................................................................. Passim

*Yarway Corp. v Eur-Control USA, Inc.,*
775 F.2d 268 (Fed. Cir. 1985) ............................................................................. 6

*Young v Dworkin,*
489 F.2d 1277 (CCPA 1974) ............................................................................... 7

<u>Rules</u>

Fed. R. Civ. P. 56 .................................................................................................. 1, 2

<u>Statutes</u>

35 USC §102 ......................................................................................................... 1, 3, 7

35 USC §112 ......................................................................................................... Passim

35 USC §282 ......................................................................................................... 7

Other

*American Heritage Dictionary of the English Language,*
3rd Edition, 1996 ................................................................................. 9, 10

*McGraw-Hill Dictionary of Scientific and Technical Terms,*
3rd Edition ....................................................................................... 10

*Random House Unabridged Dictionary,*
2nd Edition, 1993 ............................................................................ Passim

*Roget's Thesaurus,*
3rd Edition, copyright 1962 ................................................................ 12

*Webster's Third International Unabridged Dictionary* ............................................ 10, 12, 13

<u>LIST OF EXHIBITS</u>

Exhibit A ............. Relevant pages from the depositions of Douglass E. Hughes

              Hughes Dep. Exhibit 4     Photograph of filtration system

              Hughes Dep. Exhibit 6     Photograph of blue filter

              Hughes Dep. Exhibit 9     Photograph of charcoal filter

              Hughes Dep. Exhibit 10    Photograph of water bottle

              Hughes Dep. Exhibit 21    Photograph of Brita and Safari filter

              Hughes Dep. Exhibit 34    Synergy drawing "Block Filter, New Outback, Safari, Rev. 3, 5/7/99

              Hughes Dep. Exhibit 37    Drawing (Left and Right Drawing) Section A-A

              Hughes Dep. Exhibit 39    Synergy drawing Housing Bottom, New-Outback, Safari

              Hughes Dep. Exhibit 42    Synergy drawing Housing Top, New-Outback, Safari

              Hughes Dep. Exhibit 54    Color photograph of McNett filter (cross-section)

              Hughes Dep. Exhibit 55    Color photograph of McNett filter (exterior)

Exhibit B ............. Nohren, Jr. et al. U.S. Patent 5,609,759 in suit

Exhibit C ............. Evidentiary Declaration of John E. Nohren, Jr. (with attachments)

Exhibit D ............. Safari's Responses to Innova's Interrogatories 1 & 2

Exhibit E ............. Hughes et al. U.S. Patent 5,840,185

Exhibit F ............. Expert Witness Report of Paul Michael Pedersen

Exhibit I ............... Dictionary definitions

Exhibit J ............. Declaration of Robert A. Vanderhye

Exhibit K ............. Wadsworth et al. U.S. Patent 5,976,362

Exhibit L.............. Relevant pages of the Prosecution History of the '759 Patent

Exhibit N............. Dehn et al. U.S. Patent 2,055,096

Exhibit O............. Parker U.S. Patent 690,457

Exhibit P ............. Daniels U.S. Patent 5,431,813

## INNOVA'S MOTION AND INCLUDED MEMORANDUM FOR
## PARTIAL SUMMARY JUDGMENT OF INFRINGEMENT AND VALIDITY

The plaintiff Innova Pure Water, Inc. ("Innova") hereby files this motion for summary judgment pursuant to Rule 56 asking the Court to find that the product at issue in this litigation marketed by the defendant Safari Water Filtration Systems, Inc. ("Safari") are a literal infringement of claims 1, 5, 11, 15 and 17-20 of U.S. patent 5,609,759 ("the '759 patent"); and that those claims are valid under 35 USC §§102 and 112.

I.      FACTUAL BACKGROUND

There is no dispute as to what the Safari products are, nor what the '759 patent claims, nor what the prosecution of the '759 patent before the Patent and Trademark Office was. Therefore it is clear that the case is ripe for a decision by the Court especially since the issues of infringement, validity under 35 USC §102 in the circumstances here are clearly matters of law for the Court to determine.

Safari has made four basic types of filters that are infringing (see Exhibit A and documents referenced therein discussed below). All of them fit in a bottle that is Hughes deposition Exhibit 10 (all numbered exhibits are Hughes deposition exhibits). The first two, which are referenced as the white and blue initial filter cartridges, are shown by Exhibits 4 and 6 and use the filter element shown in Exhibit 9. The standard modern filter, shown by Exhibits 37, 39, and 42, and the McNett version thereof, shown by Exhibits 55 and 54, use the filter element illustrated in Exhibit 34, the "carbon block filter". Both of the filter elements of Exhibits 9 and 37 comprise activated carbon and plastic binder [Exhibit C]. The version of the Exhibit 9 filter element used with the white filter cartridge has a porosity (mean pore diameter) of about 50, whereas the filter element of Exhibit 34 and Exhibit 9 when used with the blue filter cartridge have a porosity of between about 17-30 microns (said by Safari to be about 19). [Exhibit C]

While the casing constructions of the various Safari products look different, they have identical functional features as far as the issues to be considered here are concerned. The tube of filtering material has

an open top that communicates with a housing top having a flange mount (marked up version of Exhibit 37 with Attachment C to Exhibit C) to deliver water to the manual valve of the top of the bottle (Exhibit 10), and a bottom casing component which has a bottom which closes off the bottom of the tube of filtering material. The bottom casing component, at the bottom thereof, has a check valve which prevents the flow of water into the hollow interior of the filtering element, but allows air to pass out of the hollow interior of the filtering element when the bottle with which the filter is associated has been squeezed and then is returning. The valve is totally unnecessary since the filtering material self-vents, as made clear by testing. [Exhibit C]

When the filter assembly is assembled in the bottle it operates in exactly the same manner as if the filtering assembly had been welded or otherwise connected to the bottle cap that contains the push pull manual valve. That is during operation there is no difference between the connection provided by the Safari filter cartridge, with a flange mount, than if instead of the flange the cartridge assembly were permanently affixed to the bottle cap.

Since all of the functional components of all four versions of the Safari product are substantially identical as far as they relate to the issues here, they will simply be referred to as the "Safari product".

II.     <u>SUMMARY JUDGMENT MOTION STANDARDS</u>

Summary judgment is properly rendered when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material facet and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The standard for summary judgment under F.R.Civ. P. 56 is clear from two important Supreme Court decisions. In *Anderson v Liberty Lobby*, 106 S. Ct. 2505 (1986), the Court made it clear that summary judgment was a salutatory procedure for weeding out improper claims that waste the resources of the Court and the parties, and should be implemented when "a party ... fails to make a showing sufficient to establish existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial". It does not make any difference who files a motion for summary judgment, the party having the burden of proof on the issue of summary judgment must make a prima facie case that it can carry that burden. *Celotex Corp. v Catrett*, 477 U.S. 317, 322 (1986). When faced with a motion for summary judgment, a party may not merely say that its evidence will be fully presented and deduced at trial, and hope that evidence will turn up to support its position. *Appolonio v Baxter*, 217 F.2d 267, 271 (6th Cir. 1954).

That summary judgment is a favored salutary procedure is true in patent cases too is clear from *Barmag Barmer Maschinefabrik AG v Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed. Cir. 1984) where then chief judge Markey held:

> "Barmag asserts that patent cases generally are inappropriate for summary judgment disposition. We disagree. Summary judgment is as appropriate in a patent case as in any other."

Summary judgment is particularly appropriate on the issue of infringement since claim construction is a question of law (*Markman, infra*), on the issue of validity under 35 USC §112 (*North American Vaccine, infra*), and the issue of sufficiency of prior art proofs under 35 USC §102 (*Woodland Trust, infra*).

In this case since Innova is the patent owner Innova has the burden of proof on the issue of infringement. *Lemelson v United States*, 752 F.2d 1538, 1547-8 (Fed. Cir. 1985). As the infringer, Safari has the burden on invalidity. See *Hybritech, infra*.

III.    <u>THE LAW REGARDING INFRINGEMENT</u>

In the first step of the infringement analysis, the Court construes the meaning of the claim language by referring to certain intrinsic evidence. The intrinsic evidence to be considered by the Court comes from three sources: the claims themselves and the ordinary and accustomed meaning of the words employed, the written description of the specification (which describes one or more embodiments of the invention in sufficient detail to enable one of ordinary skill in the art to make and use the invention), and the patent's prosecution history. *Markman v Westview Instruments, Inc.*, 52 F.3d 967, 976, 979 (Fed. Cir. 1995), *aff'd*, 116 S.Ct. 1384 (1996).

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996).

In the second step of the literal infringement analysis, the trier of fact determines whether the claims as construed by the Court "read on" (or cover) the accused device or method. *Markman*, 52 F.3d at 976. Infringement of a claim is proven if the device contains every element of a claim as properly construed, or its equivalent. See *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 796 (Fed. Cir. 1990). Where, as here, no dispute exists over the structure of Safari's products, no genuine issue of material fact exists, and the Court should resolve the issue of infringement as a matter of law. *Celotex*, 477 U.S. at 322.

Claim construction is readily amenable to summary judgment. *Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1578 (Fed. Cir. 1995). Claim construction is a matter of law for the Court to decide. *Markman v Westview Instruments, Inc.*, at 116 S.Ct. 1393-95.

IV.     <u>THE RULES OF CLAIM CONSTRUCTION</u>

The obvious starting point for interpreting the meaning of a patent claim is with the words of the claim itself. Absent some other objective, clearly-stated intrinsic evidence to the contrary, words used in a claim are to be given their ordinary and accustomed meaning, such as defined in a dictionary. *Vitronics*, 90 F.3d at 1582; *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 530 (Fed. Cir. 1995). Similarly, technical terms used in a claim are generally interpreted according to how persons of ordinary skill in the art would understand them. *Vitronics*, 90 F.3d at 1582; *Intellicall, Inc. v. Phonometrics, Inc.*, 952 F.2d 1384, 1387-88 (Fed. Cir. 1992).

The patent specification, with its disclosure of the claimed invention, may also be helpful in understanding the meaning of claim terms in light of that disclosure. Care should be taken, however, to make certain that extraneous limitations from the specification and drawings -- especially details of the preferred embodiment -- are not improperly read into the claims. *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433-34 (Fed. Cir.), *cert. denied*, 488 U.S. 986 (1988). The prosecution history of the

patent before the PTO may sometimes also provide clues as to what the applicant meant by certain terms used in the claims. *Southwall, supra,* at 54 F.3d 1576.

Most errors of claim construction result from reading illustrations or words from the patent specification, drawings, and file history into the claims. The Federal Circuit Court of Appeals has universally held that limitations from the specification, drawings, and prosecution history may not be read into a claim for any purpose. See the definitive statement by the Court in *Intervet America v Kee-Vet Laboratories,* 887 F.2d 1050, 1053 (Fed. Cir. 1989).

A good example of the common error that caused reversal in *Intervet* is apparent from the decision in *SRI International v Matsushita Electric Corporation,* 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*). There the invention comprised first and second grids of a spatial filter with the second grid positioned so that it was "relatively angularly superimposed over all of said first grid". The specification called for one of the two grids to be oriented vertically. The Federal Circuit, *en banc,* reversed a construction requiring one of the grids to be oriented vertically, holding:

> "When claim construction is required, claims are construable, as above indicated, in light of the specification, *United States v Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966), yet '[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims.' *Raytheon Co. v Roper Corp.,* 724 F.2d at 957, 220 USPQ at 597. If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of prior art, claim more broadly than that embodiment."

The Court went on to say that there is no requirement under the law for an applicant to put every known existing example in his or her application to have the claims cover them, and of course it is impossible to predict all future constructions:

> "The law does not require the impossible. Hence, it does not require that an applicant describe in his specification <u>every conceivable</u> and <u>possible future</u> embodiment of his invention." *Id.* at 1121 (emphasis added)

Another doctrine that highlights the decisions in *SRI* and *Intervet* is the doctrine of "claim differentiation". Under the doctrine of claim differentiation, an independent claim cannot be interpreted so as to render the limitations in a dependent claim meaningless or contrary. See *Yarway Corp. v Eur-Control USA, Inc.,* 775 F.2d 268, 274, 275 (Fed. Cir. 1985).

Also significant is the construction of the word "comprising" which has a particular meaning in patent law. The word "comprising" appearing in the preamble of the claim is a term of art in the patent profession which signifies that the claim is "open ended", and not limited to the specific elements recited. See *Stiftung v Renishaw PLC,* 945 F.2d 1173, 1178 (Fed. Cir. 1991):

> "Indeed, claim 2, which uses the term 'comprising,' is an 'open' claim which will read on devices which add additional elements:
>
>> It is fundamental that one cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device. For example, a pencil structurally infringing a patent claim would not become noninfringing when incorporated into a complex machine that limits to controls what the pencil can write. Neither would infringement be negated simply because the patentee failed to contemplate use of a pencil in the environment.
>
> *A.B. Dick Co. v Burroughs Corp.,* 713 F.2d 700, 703, 218 USPQ 965, 967-68 (Fed. Cir. 1983), *cert. denied,* 464 U.S. 1042, 104 S.Ct. 707, 79 L.Ed.2d 171 (1984) (citation omitted)."

Finally, an accused device cannot escape infringement by merely adding features if it has otherwise adopted the basic features of the claimed invention. *Radio Steel & Mfg. Co. v MTD Products, Inc.,* 731 F.2d 840, 848 (Fed. Cir. 1984). Similarly, an accused device that contains the same features as the patented device cannot escape infringement because that feature performs an additional function it does not perform in the patented device. *Id.* Nor does an infringer escape liability by merely impairing or improving on the patentee's invention. *Temco Electric Motor Co. v Apco Mfg. Co.,* 275 U.S. 319, 328 (1928). Improvement of the plaintiff's invention, while possibly affording the basis for a separate patent on the improvement, does not

constitute a defense to infringement, nor does a separate patent on the infringement preclude it from being

one (nor provide any evidence that it is not). *Bendix Corp. v U.S.*, 199 USPQ 203, 222 (Ct. Cl. 1979);

*Studiengesellschaft Kohle mbH v Dart Industries*, 549 F.Supp. 716, 746 (D. Del. 1982), *affirmed*, 726 F.2d

724, 728 (Fed. Cir. 1984).

V.     <u>LEGAL STANDARDS WITH RESPECT TO VALIDITY</u>

An issued patent carries a statutory presumption of validity under 35 USC §282, which must be

overcome by proving facts supported by clear and convincing evidence. *Hybritech, Inc. v Monoclonal*

*Antibodies, Inc.*, 802 F.2d 1367, 1375, (Fed. Cir. 1986), *cert. denied*, 107 S.Ct. 1606 (1987). When the issue

is anticipation by an allegedly prior invention of another that was in public use or knowledge as is made clear by

*Woodland Trust v Flower Tree Nursery*, 148 F.3d 1368 1373 (Fed. Cir. 1998), in order for there to be a clear

and convincing showing of knowledge or use available to the public so as to constitute prior art there must be

<u>contemporaneous</u> documentation. All of 35 USC §102(a), (b), or (g) <u>require</u> actual public activity with respect

to an invention. For example, with respect to 102(a) and (b) *Woodland, supra*, at 148 F.3d 1370, makes it

absolutely crystal clear that the alleged prior art must be available to the public at large, while under 35 USC

§102(g), even if there is an earlier reduction to practice (which must also be proven by clear and convincing

evidence and contemporaneous documentation) where steps are not taken to publicize it it is considered

suppressed or concealed and therefore not prior art.

A patentee who conceives an invention while it is suppressed or concealed by another, and then

diligently reduces the invention to practice, is the first inventor under the law and entitled to a patent. 35 USC

§102(g), *Palmer v Dudzik*, 481 F.2d 1377, 1385, 1387 (CCPA 1973), *Young v Dworkin*, 489 F.2d 1277, 1281

(CCPA 1974). Factors supporting a finding of concealment or suppression include no public dissemination of

documents describing the invention or products according to the invention, not publicly using the invention,

and/or not filing a patent application. *International Glass Co. v United States*, 408 F.2d 395, 403 (Ct. Cl. 1968) (law of the Federal Circuit under *South Corporation v United States*, 690 F.2d 1368, 1370 (Fed. Cir. 1982)). Whether an invention has been suppressed or concealed is a question of law. *Paulik v Rizkalla*, 760 F.2d 1270, 1280 (Fed Cir 1985).

With respect to the definiteness requirement of 35 USC §112, compliance with that requirement is a question of law. *North American Vaccine v American Cyanamid Co.*, 7 F.3d 1571, 1579 (Fed. Cir. 1993).

"Whether a claim is invalid for indefiniteness depends on whether those skilled in the art would understand the scope of the claim when the claim is read in light of the specification." *id.*

The mere fact that there is disagreement concerning the meaning of claims does not in any way indicate lack of clarity so as to be invalid under §112. *Id.* A determination of claim indefiniteness is a legal conclusion that the Court evaluates consistent with its performance of its duty as the construer of patent claims. *Atmel Corp. v Information Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999).

VI.    THE SAFARI PRODUCT CLEARLY LITERALLY INFRINGES THE RELEVANT CLAIMS

Innova hereby presents the two step analysis that is necessary to determine infringement, claim interpretation, and then reading the properly interpreted claims on the infringing Safari product.

A.    The Disputed Claim Terms Have Clear Unambiguous Meanings

In this particular case the only limitations of independent claims 1 and 15 at issue that are relevant for the court's consideration are as follows:

The claim limitations which Safari maintains are in dispute are identified in Safari's response to interrogatory 1, attached as Exhibit D.

The first limitation is the following limitation from claim 1 of the '759 patent:

"a tube of filtering material, having a substantially continuous liquid-porous side wall, a hollow interior, a first closed end, and a second open end ... wherein said filtering material comprises a substantially continuous self-supporting, self-venting, body of activated carbon and binder".

It is clear from Safari's interrogatory responses that Safari believes that the first closed end must be of filtering material, and that something cannot be "self-venting" if it has an additional vent. Safari's position does not consider what the claim itself says, which is the first rule of claim interpretation.

The claim calls for a tube of filtering material. The word "tube" is a common everyday English word meaning, for example, *Random House Unabridged Dictionary*, 2nd Edition, 1993 [all dictionary definitions are provided in Exhibit I hereto]. A hollow, usually cylindrical body of metal, glass, rubber, or other material used esp. for conveying or containing liquids or gases." The tube at issue here is recited specifically to be of a filtering material (that is the material as specified), and later on in the claim the filtering material is said to comprise (a word of art as described earlier) a substantially continuous self-supporting, self-venting body of activated carbon and binder. The tube is said to have a substantially continuous liquid-porous side wall, a hollow interior, a first closed end, and a second open end. The description of the side wall, interior, and ends are limitations on the word "tube", not on the material of which the tube is made, namely "filtering" material. That is, there is no statement whatsoever that the first end of the tube is closed by filtering material, simply that it is closed. Just as obviously the filtering material cannot be "open" but only the tube second end can be "open". This is made clear further on in the claim where the terminology "said tube second open end" is used -- that is it does not say "the filtering material open end".

The alleged dispute about the word "self-supporting" is sanctionably frivolous. The plastic housing of the Safari filter has an unconnected top and bottom. The filter material tube connects the two together and has no other elements. Thus it is clearly as self-supporting as the filter tube in the '759 patent disclosure. See the definition of "self-supporting" from the *American Heritage Dictionary*. "act of or capacity for supporting oneself".

All phrases that start with "self" and contain another word have common ordinary meanings. Therefore Safari misrepresents that the meaning of "self-venting" is not clear.

Claim 1 calls for the <u>filtering material</u> to be self-venting; not the tube but the filtering material. The term "self-venting" is clear no matter what dictionary is viewed. For example, the *American Heritage Dictionary of the English Language*, 3rd Edition, 1996 defines "self-" as "a prefix conveying ... automatic; automatically: as in self-loading." *Webster's Third International Unabridged Dictionary* has a totally consistent definition: "self- *comb form* c: by oneself or itself: independent: automatic <*self-*rule> <*self-*propelled> <*self-*feeder> <*self-*action>". The *Random House Unabridged Dictionary*, 2nd Edition, copyright 1993, page 1735 definition is virtually identical "self-, a combining form of self and variously used with the meanings ... 'automatic' (self-operating)." Actual exemplary definitions of the "self-" combined term in various dictionaries illustrate how clear and consistent this terminology is: For example the *Webster's Third International Dictionary* defines "self-rising" as "rising or capable of rising by itself"; "self-righting" as "capable of righting itself when capsized"; "self-sealing" as "capable of sealing itself after puncture"; and "self-starting" as "capable of starting by oneself or itself". The *McGraw-Hill Dictionary of Scientific and Technical Terms*, 3rd Edition, has similar examples of "self-" combined terms used in everyday technological senses; for example, see: "self-adapting system [SYS ENG] A system which has the ability to modify itself in response to changes in its environment." [page 1443] and "self-cleaning [ENG] Pertaining to any device that is designed to clean itself without disassembly.

The word "venting" as used in this context is also clearly no mystery. For example, the *American Heritage Dictionary* defines the noun "venting" as meaning "to release or discharge (steam, for example) through an opening." The other dictionaries quoted above do not define "venting" *per se* but clearly define the word "vent" in the same context. For example, the *McGraw-Hill Technical Dictionary* defines "vent" as an engineering term to mean "4. An opening provided for the discharge of pressure with the release of pressure from tanks, vessels, reactors, processing equipment, and so on." *Webster's Unabridged Dictionary* defines "vent" as follows: "vent\'vent\vb -ED ... 1: to provide with an opening for the discharge of gases or the relief of

pressure <~ a plumbing system>: equip with a vent or venting  2a:  to serve as a vent for <tall chimneys ~*ed* the smoke>  b(1):  to cause to flow or drain away: cast our:  EXPEL  <~*ing* off the excess fluid body: EVACUATE".  Similarly, the *Random House Unabridged Dictionary* defines "vent ... v.t." as "11.  To release or discharge (liquid, smoke, etc.) ... 13.  To be relieved of pressure or discharge by means of a vent."

Thus, there clearly, positively, and unequivocally is no ambiguity whatsoever to what the term "self-venting" means. Self-venting means, in the context of the claim, filtering material that has the ability or capability to vent gas by itself.

Thus, with respect to the first "disputed" limitation, the language of the claim itself, using the common ordinary meaning of the terms, and without reading limitations into the claim (as is prohibited by *SRI, supra*), the only interpretation that one can come up with is that there is a tube of filtering material.  The tube has a continuous liquid-porous side wall, a hollow interior, a first closed end, and a second open end.  The filtering material which makes up the tube is a self-supporting, self-venting body of activated carbon and binder, being capable of supporting itself (that is standing alone without extraneous supports) and being capable of venting gas without any extraneous structure.

The next "disputed" limitation in claim 1 of the '759 patent is "said tube operatively connected to said cap second surface at said tube second open end".  Safari feigns confusion about what the term "operatively connected" means, and attempts to use the abstract of the disclosure (which is not a claim and therefore irrelevant) to say that "operatively connected" must be limited to the specific examples illustrated in the drawings and described in the specification of the '759 patent.

The term "operatively connected" is used in more than 90,000 U.S. patents [Exhibit J], and is common broad terminology in patent law meaning any type of joining or linking of components so that they operate to perform a designed function.  This is abundantly clear from a patent of Safari's own licensee, Brita, U.S. patent

5,976,362 (Exhibit K) which uses the term "operatively connected" three times, each in an entirely consistent manner in describing a water filtration product. "Operatively connected" in the '362 patent is used to describe components in a filter assembly that engage each other when assembled, but are not permanently affixed to each other, and to generically describe a connection between a light and a module component, with no details of how the light and the module component are connected. [Exhibit J]

That the term "operatively connected" generically describes some sort of joining or linking between components when they are functioning together is also clear from any dictionary definition of the words "operatively" and "connected". While any dictionary definition can be used, see particularly the *Webster's Dictionary* discussed above which defines "connected" as " '1: joined or linked together <a ~ series> 2: having the parts or elements logically related <a ~ view of the problem> or continuous <~ reading from the great authors>", while the *Random House Dictionary* on page 431 defines "connected" as "1. united, joined, or linked".

While not typically specifically defining "operatively" but rather recognizing that it is simply a form of the word "operative," dictionary definitions also make it undeniably clear that "operatively" means producing a desired effect, that is properly functioning. For example, see the *Webster's Dictionary:* "operative ... 1: producing an appropriate or designed effect: EFFICACIOUS <an ~ dose> <an ~ word> 2.: having the power of acting: exerting force or influence: OPERATING <an ~ motive> <an ~ force>". The *Random House Dictionary* (page 1358) defines the adjective form ("operatively" being the adverb form) of the word "operative" as: "4. operating, or exerting force, power or influence ... 6. effective or efficacious". *Roget's Thesaurus*, 3rd Edition, copyright 1962, lists as synonyms for the adjective "operative" "operational, functional, practical; effective, effectual, efficient, efficacious".

Thus, it is clear that the term "operatively connected" simply means that during operation the cap and the tube of filtering material are functionally joined or linked at the open end of the tube so that liquid will flow through the tube out of the open end and then through the manual valve in the cap. It is completely impermissible to read into this terminology the specific embodiments set forth in the specification or drawings (*Intervet, supra, SRI, supra*), and it is inappropriate to read more language into the claims than the words themselves (see *Genentech, Inc. v Chiron*, 112 F.3d 495, 501 (Fed. Cir. 1997), where the court refused to insert the word "direct" before the word "joined" (connected) since it wasn't in the claim). Here, there is no appropriate basis upon which the word "permanently", or a like word, could be inserted before the word "connected", as *Safari* apparently argues.

Another interpretation problem is the "activated carbon and binder" recitation. In the interrogatory responses (Exhibit D) Safari fraudulently maintains that the '759 patent specification mentions "porous plastic" and since the activated carbon and binder composition that Safari uses they refer to as "porous plastic" that activated carbon and binder cannot be interpreted to mean exactly what it says. However if one looks at column 2, lines 56 and 57 of the '759 patent [Exhibit B; also see Exhibit C] it is clear that what is talked about there is an embodiment (related to claim 15, not claim 1) where the term "porous plastic" is used to describe plastic that allows water to flow through it and with the filtering material inside. There is absolutely no distinction whatsoever made between the percentage of activated carbon and binder in the filtering element in the claims at issue. This is made absolutely clear by claim 7 which calls for the ranges of carbon and binder which cannot be read into the claims. Also see Exhibit 34 where Safari itself refers to its filter element as a "carbon block filter".

Another fraudulent argument raised in the interrogatory responses relates to "porosity of about 10-120 microns". The statement that the term could be construed as a "medium [sic "mean"] pore diameter" of

about 65 is grossly erroneous. The language "about 10-120 microns" clearly and unequivocally means any porosity level (mean pore size) within that range, and there is absolutely no case law to the contrary.

With respect to claim 15, the "operatively connected" terminology is identical to that in claim 15, and the bottle (see Exhibit 10) is also recited.   Also, for all practical purposes, the "tube" limitation is the same in claim 15 as in claim 1, although the language is different.

In claim 15 the language is "a self-supporting, self-venting tube of or containing filtering material capable of reducing the level of chlorine and water passing therethrough by at least 50% at a flow rate of about 5 ml per second, said tube having a substantially continuous liquid porous side wall having an access; a hollow interior; a first closed end, and a second open end". In fact in this particular language it is even clearer that the first closed end of the tube need not be of filtering material because the language of the claim is that the tube is "of or <u>containing</u> filtering material". Thus, the basic interpretation here is essentially the same as with respect to claim 1, there is no basis for requiring that the closed end of the tube be a filtering material.

In claim 15, however, different than in claim 1, the tube itself is recited as self-venting. However, all that means is that the tube is capable of venting by itself. The claim does not say that it excludes tubes that have unnecessary, additional structures (such as the check valve in the Safari product) which might also provide a venting function.

Another item relating to claim interpretation of Safari's assertion that "about 50 mm or less" as the inside diameter of the bottle cannot be interpreted to cover 53 mm. The word "about" means just what it says, approximately. There is absolutely no basis for arguing that a difference of 6% in a recited value, which has absolutely no affect whatsoever on functionality, preclude coverage. In this regard, see *Modine Mfg. Co. v U.S. Intern. Trade Comm'n,* 75 F.3d 1545, 1554-6 (Fed.Cir. 1996) where a difference of about 22% in a dimension, with no affect on functionality, was considered to clearly be within the definition of "about."

In this particular situation neither the specification nor the file history is particularly relevant to claim construction, because the claim terms at issue are self-evident. The patent disclosure does make it clear, however, that there are <u>numerous</u> species of relationships between the cap and the tube that are encompassed the term "operatively connected", and there is absolutely no basis to conclude that there is any limit on functionality. Also, the fact that Innova did not attempt to distinguish between the Parker (Exhibit O), Daniels (Exhibit P), and Dehn et al (Exhibit N) references, which have flange mountings similar in some respects to the Safari product, by saying there was no operative connection means that the term "operatively connected" is clearly broad enough to cover the mounts of all of these references, and the Safari product.

Similarly, the inherent self-venting feature[1] of Innova's filter was not described in the prosecution history as something different than what the clear words mean. The Parker 690,457 patent (Exhibit O) was distinguished on page 4 of the August 1, 1996 amendment (L-47) by saying that it required a vent tube 16 having a bottom aperture 17, which is totally distinct from the liquid passage, and that gases vented out through the top in an entirely different manner (see separate vent hole 19 distinct from the liquid path through the filter in Parker, Exhibit O). Innova did not say that "self-venting" does not cover an arrangement where a separate vent tube is not required in order for the structure "to function properly".

Similarly with respect to the self-supporting limitation, the Parker [Exhibit O] filter was said at L-47 to require a rod 6 and clamping washer 7 and nut 8 to hold the filter together. This has nothing to do with the free-standing filter elements of Safari and the '759 patent disclosure which support themselves without a rod, clamp and washer. [Exhibit C] To interpret the claim otherwise would be to interpret it so that it did not cover

---

[1] *In re Reynolds*, 443 F.2d 384, 389 (CCPA 1971): "By disclosing in a patent application a device that inherently performs a function, operates according to a theory, or has an advantage, a patent applicant necessarily discloses that function, theory or advantage even though he says nothing concerning it."

the preferred embodiment in the '759 patent, something entirely unacceptable. See *Vitronics Corp. supra,* at

90 F.3d 1583 and *Hoechst Celanese Corp. v BP Chemicals, Ltd.,* 78 F.3d 1575, 1581 (Fed.Cir. 1996).

Note the fact that Safari has a patent on the cooperation between the bottle top and the filter

cartridge, and that during the prosecution of that patent the '759 patent was considered, says absolutely

nothing about whether or not the claim limitations of the '759 patent are infringed. See *Bendix, supra,* and

*Studiengesellschaft Kohle mbH, supra.* Also, the Safari patent (5,840,185, Exhibit E) does not illustrate the

same thing as in the Safari commercial product. Figure 5 of the '185 patent shows "capped knife" 62 which

has a tapered outer surface 68 which engages the tapered surface 34 of the filter. The bottles which Safari

sells (Exhibit 10), or uses, with its filter do not have a tapered surface 68 on a cap, and/or it is useless for

forming a seal. The cap on the commercial Safari product has a ring not resembling the tapered surface 68 of

the cap shown in figure 5 of the '185 patent and/or the ring is irrelevant. [Exhibit C]

B.     All of the Limitations of Claims 1, 5, 11, 15,
       and 17 through 20 Are Found in the Safari Product

As Attachment C to the Nohren Declaration of Exhibit C makes clear, there is a direct correspondence

between the terms in all of the claims at issue and the Safari product. With respect to the disputed limitations

note that the Safari product has a tube of filtering material that has a liquid porous side wall, a hollow interior,

and a first end closed by a filter assembly wall 27 and a check valve, with an open end 28 which communicates

with the manual valve 20. The tube 25 is definitely self-supporting. That it is self-venting (capable of venting

by itself) is clear from the testing set forth in Exhibits F and C, where it is described how when the check valve is

taped over or otherwise rendered inoperable (making the structure essentially identical to that illustrated in

Figure 9 of the '759 patent where a bottom 47 is provided which is solid -- see column 6, lines 1-5 of the '759

patent, Exhibit B) the functionality of the venting action is imperceptibly different (Exhibits C and F). The tube

end 27 is closed when water passes through, and the end 28 is always open to allow filtered water to flow through the manual valve 20 when opened.

As an inspection of Attachment C to Exhibit C makes clear, when the components of the Safari product are assembled for operation (so that they are operatively connected, i.e. so that they function together) the cap and the tube are connected to each other. In fact, except when one is replacing the filter element, the filter element in the Safari product is as positively connected to the cap as in any embodiments actually illustrated in the '759 patent drawings!

With respect to claim 15, although the same interpretation as set forth above may be given to clearly determine infringement, an alternative interpretation may also be given to demonstrate infringement. That is, that the tube of claim 15 may be considered to be the outer tubular element containing the filtering material 25, and that the outer element has an open end and closed end and all of the other limitations of claim 15 including the filtering material therein being capable of reducing the level of chlorine and water passing therethrough by at least 50% at a flow rate of about 5 ml per second.

Note the fact that the Safari product contains the unnecessary check valve at the bottom of the tubular housing does not remove it from the claims. As discussed above, claim 1 calls for the filtering material to be self-venting, not the tube, and clearly the filtering material 25 of the Safari product is self-venting. Since the claim clearly uses the open ended "comprising" language the addition of the check valve at closed end 27 makes no difference as far as literal infringement is concerned. Also, the fact that the check valve is added does not allow the Safari product to escape infringement in view of *Stiftung, supra*, and *Radio Steel, supra*, nor does the fact that the check valve <u>might</u> (although that is unclear) improve the venting time by an imperceptible amount (about one second if the bottle is not tuned upright during reinflation) make it a non-infringement. *Temco Electric Motor, supra.*

Thus claims 1, 5, 11, 15, and 17-20 are clearly literally infringed by the Safari product.

VII.     INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS

Even if there were some minor difference between what is set forth in claims 1, 5, 11, 15, and 17 through 20 of the '759 patent and what is provided by the Safari product, the differences are insubstantial, and the Safari individual components perform substantially the same function in substantially the same way to get substantially the same result as they do in the claimed invention [Exhibit C]. *Warner Jenkinson v Hilton Davis Chemical Co.*, 117 S. Ct. 1040, 41 USPQ2d 1865, 1869 (1997). Therefore, infringement under the classic test of the doctrine of equivalents (namely, function, way, and result) as set forth in *Graver Tank & Mfg. Co. v Linde Air Products Co.*, 339 U.S. 605, 609, 85 USPQ 328 (1950), and since the differences are insubstantial there clearly is infringement under the doctrine of equivalents in any event.

VIII.     THE CLAIMS ARE CLEARLY VALID

Safari's interrogatory answers [Exhibit D] show absolutely no basis whatsoever for any serious claim of invalidity. Mr. Luzenberg, who is referenced as the alleged first inventor, was the defendant in a law suit with Innova and after he was found to be an infringer by summary judgment he entered into a consent decree admitting the patent's validity. See Attachment E to Exhibit C. Thus, the alleged earlier inventor has himself admitted that the patent is valid, this fact alone making it essentially impossible for Safari to establish invalidity by clear and convincing evidence.

Further, pursuant to *Woodland, supra*, since Safari has no contemporaneous documentation (or anything aside from the testimony of witnesses having an interest) of any earlier activity by Mr. Luzenberg (that is prior to the at least as early as August, 1994 actual reduction to practice date of the '759 claimed invention) Safari cannot possibly satisfy the burden for the same reasons as in *Woodland*.

Further, with respect to the 35 USC §112 issues, the only arguments made are frivolous, and are completely disposed of when proper interpretation is given to the claims. Safari is completely incapable of demonstrating invalidity under 35 USC §112. See *North American Vaccine*, *supra*.

IX.    CONCLUSION

In conclusion it is clear beyond reasonable doubt that there are no material facts in dispute, and that when the claims of the '759 patent are properly construed -- which is solely a question of law -- that they read right on the Safari product, and the '759 patent is clearly valid. Therefore, early grant of Innova's motion for summary judgment is respectfully requested.

Respectfully submitted,
INNOVA/PURE WATER, INC.

August 31, 2000

Robert A. Vanderhye
NIXON & VANDERHYE P.C.
1100 N. Glebe Rd., 8th Floor
Arlington, VA 22201
(703) 816-4004 (Voice)
(703) 816-4100 (Fax)

OF COUNSEL:
Frank R. Jakes (Fla. Bar #37226)
JOHNSON, BLAKELY, POPE, BOKOR,
   RUPPEL & BURNS, P.A.
100 N. Tampa St., Suite 1800
Post Office Box 1100
Tampa, FL 33602
(813) 225-2500 (Voice)
(813) 223-7118 (Fax)

CERTIFICATE OF SERVICE

I certify that on August 31, 2000 a copy of the foregoing was served via U.S. mail, first class mail, postage prepaid, to defendant's counsel: Nancy J. Faggianelli, CARLTON FIELDS, Post Office Box 3239, Tampa, FL 33601 and James R. Ghiselli, HOGAN & HARTSON, L.L.P., 1800 Broadway, Suite 2000, Boulder, CO 80302.

Michael E. Crawford

Exhibit/attachment exceeds
page limitation for scanning;
please see case file.